E-filing

**DONALD AMAMGBO**
**AMAMGBO & ASSOCIATES**
**7901 OAKPORT, SUITE 4900**
**OAKLAND, CA 94621**
**510 615 6000**
**510 615 6025**

**REGINALD TERRELL**
**THE TERRELL LAW GROUP**
**223 25TH STREET**
**RICHMOND 94804**
**510 237 9700**
**510 237 4616**

**Attorneys for Plaintiff**

ORIGINAL
FILED
MAY - 8 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
OAKLAND CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NO JOB TO SMALL, INC., on Behalf of itself and All Others Similarly Situated,<br><br>       Plaintiff,<br><br>    vs.<br><br>Pilkington North America, Inc., Nippon Sheet Glass, AGC Group (f/k/a AFG Glass or AFG Industries, Inc.), Asahi Glass Co. Ltd., Saint-Gobain Corporation, Saint-Gobain SA, Guardian Glass Corporation, and Co-Conspirators I-X,<br><br>       Defendants | No. **C08-02372**<br><br>ADR<br>MEJ<br><br>COMPLAINT<br><br>CIVIL - CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff NO JOB TO SMALL, Inc., on behalf of itself and all others similarly situated, brings this antitrust class action against Defendants, among the largest flat glass manufacturers in the world, for treble damages and injunctive relief under the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act"), and Sections 4 16 of the Clayton

-1-

Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26.  Plaintiff makes the following allegation upon information and belief and the investigation of counsel, except as to the Plaintiff, which are based on personal knowledge:

## NATURE OF THE CLAIM

1.      This case relates to a cartel among the world's leading manufacturers of flat glass to collude on the use and imposition of so-called energy surcharges to overcharge Plaintiff and other indirect purchasers of flat glass.

2.      "Flat glass" refers to glass manufactured though the "float process" whereby molten glass is fed into a bath containing a denser substance, usually molten tin, allowing the molten glass to literally "float" on the surface of the molten tin.  Defendants are among the world's largest flat glass manufacturers.

3.      Beginning in or around October 2000, Defendants agreed to adopt a common complex formula to measure energy surcharges and implemented a common $300 per truck-load energy surcharge, ostensibly relating to the cost of natural gas, on top of the cost of the flat glass. The common $300 surcharge was announced several weeks in advance of its imposition by one flat glass manufacturer, then rapidly implemented by others.

4.      From the year 2000 forward, through at least 2007, Defendants repeatedly colluded to impose common energy surcharges, using the same or substantially the same formula.

5.      On or about March 14, 2007, the European Commission antitrust regulators ("EC") served Saint-Gobain SA ("Saint-Gobain") and Pilkington plc's parent company ("Pilkington") with a Statement of Objection, which alleged that they were members of a cartel within the flat glass industry to fix or otherwise maintain the price of flat glass and related energy surcharges.

6.      During May 2007, Saint-Gobain informed its shareholders that it *would not dispute* the EC's antitrust charges that it was a member of a price-fixing cartel within the flat glass industry and would set-aside €650 million for price-fixing fines.

7.      Defendants' imposition of common energy surcharges on truck-loads of flat glass in Northern American markets, including the United States, mirrors what Pilkington and its

-2-

1    horizontal competitors and co-conspirators implemented in Europe.

2        8.    During the class periods (defined below), Defendants have publicly represented

3    that their energy surcharges reflected the actual increased cost of natural gas and diesel fuel

4    (collectively, "energy surcharges"), and that such increased costs simply were being passed along

5    to the purchasers.

6        9.    In fact, however, Defendants entered into a cartel and agreed to implement and

7    calculate the energy and diesel surcharges in a manner designed to impose and conceal millions

8    of dollars in illicit overcharges.

9        10.    Plaintiff brings this action on its behalf and as a representative, pursuant to Federal

10    Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following Classes:

11        (A)    All individuals or entities (excluding governmental entities, Defendants,
and Defendants' parents, predecessors, subsidiaries, affiliates, agents and
12    Defendants's co-conspirators) in the United States that purchased flat glass
indirectly from any of the Defendants, or Defendants' predecessors, subsidiaries,
13    affiliates or agents, and paid energy surcharges relating to natural gas at any time
during the period from January 1, 2001, through such time in the future as the
14    effects of Defendants' illegal conduct, as alleged herein, has ceased.

15

16        (B)    All individuals or entities (excluding governmental entities, Defendants,
and Defendants' parents, predecessors, subsidiaries, affiliates, agents and
17    Defendants' co-conspirators) in the United States that purchased flat glass
indirectly from any of the Defendants, or Defendants' predecessors, subsidiaries,
18    affiliates or agents, and paid energy surcharges relating to diesel fuel at any time
during the period from October 16, 2005, through such time in the future as the
19    effects of Defendants' illegal conduct, as alleged herein, has ceased.

20    **JURISDICTION AND VENUE**

21        11.    Plaintiff lodges this class action complaint against Defendants by reason of their

22    violation of Section 1 of the Sherman Act, U.S.C. § 1, as well as for injunctive relief, treble

23    damages and costs of this action, including attorneys' fees, pursuant to Sections 4 and 16 of the

24    Clayton Act, 15 U.S.C. §§ 15 and 26.

25        12.    This Court has original federal question jurisdiction over this action pursuant to 28

26    28 U.S.C. §§ 1331, 1337, Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

27        13.    Venue is proper in this judicial district pursuant to U.S.C. §§ 15, 22 AND 26 AND

28    28 U.S.C. § 1391(b) and (c) because during the Class Periods Defendants resided, transacted

-3-

1    business, were found, or had agents in this district, and because a substantial part of the events

2    giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade

3    and commerce described below has been carried out in this district.

4                                              **PARTIES**

5            14.    Plaintiff NO JOB TO SMALL, Inc. is a corporation and a resident of Rochester

6    Hills, Michigan.  During the Class Periods, Plaintiff and its subsidiaries purchased flat glass and

7    paid energy surcharges to several of the Defendants, and others.

8            15.    Defendant Guardian Glass Corporation, Inc. ("Guardian") is a privately-held

9    company based in Auburn Hills, Michigan, with European headquarters in Bascharage,

10   Luxembourg.  Guardian produces flat glass for the automotive, construction, and decorative

11   industries.  It has more than 70 domestic facilities in the United States and has numerous plants

12   and distribution centers in Europe.  On November 28, 2007, Guardian was ordered to pay

13   €148,000,000 as part of the EC's investigation into the flat glass cartel.

14           16.    Defendant Pilkington North America, Inc., ("Pilkington") of Toledo and Rossford,

15   Ohio, is wholly-owned subsidiary of Pilkington plc.  Pilkington plc's headquarters is located in

16   the United Kingdom.  On June 16, 2006, Pilkington was acquired by Nippon Sheet Glass

17   Company of Japan.  Pilkington produces glass for the automotive and building product industries,

18   and it is a major supplier of glass to replacement windshield shops in Europe, the Americas, and

19   the Asia/Pacific region.  Pilkington also manufactures building products including glass designed

20   to insulate buildings to control energy and noise.  The company's automotive glass products

21   include solar control glass, security glazing, and glass heating systems.  Pilkington has operations

22   worldwide.  Pilkington has acknowledged that it was served with a Statement of Objection for

23   engaging in a cartel to fix the price of flat glass and related energy surcharges.  During the Class

24   Periods, Pilkington unlawfully conspired with the other Defendants within the flat glass industry

25   to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.  On November 28, 2007,

26   Pilkington was ordered to pay €140,000,000 as part of the EC's investigation relating to the flat

27   glass cartel.

28           17.    Defendant Nippon Sheet Glass ("Nippon") is a Japan-based manufacturer engaged

                                                                                          -4-

                                         COMPLAINT

1  in three business segments.  The Construction Use Glass segment manufactures, processes and

2  sells float plate glass, polished wire glass, heat absorbing glass, heat reflecting glass, reinforced

3  glass, laminated glass, double-layer glass, vacuum glass, fireproof glass, template glass, mirror

4  and ornamental glass, as well as sashes.  The Automobile Use Glass segment offers float plate

5  glass, laminated glass, reinforced glass, infrared ray cutting glass, glass antenna, water-shedding

6  glass, light control glass, antifogging glass and security glass.  Nippon wholly owns Pilkington

7  and is being named as a parent of Pilkington.  During May 2007, Nippon announced that it set-

8  aside $691 million for fines relating to Pilkington's alleged membership in a cartel within the flat

9  glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.

10     18.     Defendant AGC Group ("ACG") (f/k/a AFG Glass and AFG Industries, Inc.) of

11  Kingsport, Tennessee, is the North American division of Glaverbel SA ("Glaverbel") (n/k/a,

12  AGC Group), which is based in Brussels, Belgium.  AGC is a wholly owned subsidiary of Ashi

13  Glass Company Ltd.  During the Class Periods and pursuant to Ashai's annual report, ACG

14  looked to its EU headquarters for developing strategies to enhance competitiveness.  ACG makes

15  and processes flat glass for the construction industry (exterior glazing and interior decorative

16  glass) and for specialized industries.  AGC has 40 gloat glass plants located throughout Europe,

17  North America and Asia.  AGC Flat Glass Europe acknowledged that it was served with a

18  Statement of Objection for participating in a cartel to fix the price of flat glass and related energy

19  surcharges.  During the Class Periods, AGC unlawfully conspired with the other Defendants

20  within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for surcharges.

21     19.     Defendnat Asahi Glass Company Ltd. ("Asahi") is a Japan-based glass

22  manufacturer.  Along with its subsidiaries and associates, Asahi has four business segments.  The

23  Glass segment chiefly manufactures and sells sheet glass, glass for automobiles, construction

24  materials and others.  Asahi wholly owns ACG Flat Glass Europe and AGC North America.

25  Asahi is being named as the parent of ACG, which is alleged to be a member of a cartel within

26  the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.

27  On November 28, 2007, Asahi was ordered to pay €65,000,000 as part of the EC's investigation

28  relating to the flat glass cartel.

-5-

20.    Saint-Gobain Corporation is headquartered in Valley Forge, Pennsylvania, and also has subsidiary headquarters in Arizona, Michigan, New Jersey, and Washington. In North American markets, some of its brands include BPB, CertainTeed, Euroglass Corp., Exprover, Norton, Sekurit USA, Solarglas, VetroTech and Vetrotex. During the Class Periods, Saint-Gobain Corporation unlawfully conspired with the other Defendants within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.

21.    Saint-Gobain SA ("Saint-Gobain") is headquartered in Courbevoie, France, and is a producer, processor, and distributor of numerous materials (glass, ceramic, plastics, east iorn, etc.). Saint-Gobain's North American flat glass operations are controlled by Saint-Gobain Corporation. Saint-Gobain transforms raw materials into advanced products for every day use, such as glass for building and automotive applications. It operates in 54 counties worldwide and fields a workforce of over 207,000. Saint-Gobain has over 45 subsidiaries or affiliates in the United States. Saint-Gobain is listed on the stock markets in Paris, London, Frankfort, Zurich, Brussels, and Amsterdam. Its website makes the claims that it is Europe's number 1 and the world's number 3 flat glass producer. On April 26, 2007, Saint-Gobain announced that *it would not dispute the EC's allegations that it participated in a cartel to fix prices of flat glass*, and it set aside €650 million for penalties. On November 28, 2007, Sant-Gobain was ordered to pay €133,900,000 as part of the EC's investigation relating to the flat glass cartel.

## UNNAMED CO-CONSPIRATORS

22.    On information and belief, at all relevant times, other flat glass manufacturers, referred to herein as "additional co-conspirators" conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these additional co-conspirators as though set forth in full.

## DEFENDANTS' AGENTS

23.    Each Defendant acted for itself or by and through its local agents, who sold flat glass with energy surcharges for it and under its name. As such, each Defendant is responsible for all acts or omissions of any of its agents. The acts complained of herein have been within the apparent authority of Defendants, have been to their benefit, and have been ratified by

-6-

1  Defendants.

2  ### RELEVANT NON-PARTIES

3      24.    PPG Industries, Inc. is a publicly traded company based in Pittsburgh,

4  Pennsylvania, with European operations in England, France, Germany, and Italy.  PPG produces

5  flat glass for the automotive, construction, and decorative industries.  Although PPG is not a

6  named defendant, its implementation and increases of energy surcharges mirror that of

7  Defendants Pilkington and AGC.

8  ### CLASS ACTION ALLEGATIONS

9      25.    Plaintiff brings this action on its own behalf and as a representative, pursuant to

10  Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following Classes:

11      (A)    All individuals or entities (excluding governmental entities, Defendants,
and Defendants' parents, predecessors, subsidiaries, affiliates, agents and

12  Defendants' co-conspirators) in the Unites States that purchased flat glass

13  indirectly from any of the Defendants, or Defendants' predecessors, subsidiaries,
affiliates or agents, and paid energy surcharges relating to natural gas at any time

14  during the period from January 1, 2001, through such time in the future as the
effects of Defendants' illegal conduct, as alleged herein, has ceased.

15

16      (B)    All individuals or entities (excluding governmental entities, Defendants,
and Defendants' parents, predecessors, subsidiaries, affiliates, agents and

17  Defendants' co-conspirators) in the United States that purchased flat glass

18  indirectly from any of the Defendants, or Defendants' predecessors, subsidiaries,
affiliates or agents, and paid energy surcharges relating to diesel fuel at any time

19  during the period from October 16, 2005, through such time in the future as the
effects of Defendants' illegal conduct, as alleged herein, has ceased.

20      26.    Because such information is in the exclusive control of Defendants, Plaintiff does

21  know the exact number of Class members.  Due to the nature of the trade and commerce

22  involved, however, Plaintiff believes that Class members number at least in the thousands and are

23  sufficiently numerous and so geographically dispersed throughout the United States that joinder

24  of all Class members is impracticable.

25      27.    There are questions of law or fact common to the Classes, which predominate over

26  individual issues, including:

27      a.    Whether Defendants engaged in a combination or conspiracy
among themselves to unlawfully institute and implement energy surcharges in the

28  United States:

-7-

b.      Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully fix, peg, raise, maintain, and/or stabilize energy surcharge prices charged for energy surcharges within the United States;

c.      The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      The effect of Defendants' conspiracy on the energy surcharge prices, and ultimate prices, charged for flat glass within the United States during the Class Periods;

f.      Whether the conduct of Defendants, as alleged in this Complaint, caused injury to Plaintiff and the other members of the Classes; and

g.      The appropriate measure of damages sustained by Plaintiff and other members of the Classes.

25.      The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade or the commerce involved, Plaintiff believes that the members of the Class are geographically dispersed throughout the world, including throughout the United States, and that joinder of all Class members would be impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are not less than thousands of Class members and that their identities can be learned from Defendants' and their co-conspirators' books and records.

28.      Plaintiff will fairly and adequately protect the interests of the Classes, and its interests are coincident with and not antagonistic to those of other members of the Classes. Plaintiff is represented by counsel competent and experienced in the prosecution of complex litigation, including antitrust class action litigation.

29.      A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment is necessary to permit adjudication of claims by many Class members who

-8-

1  otherwise could not justify the considerable expense to litigate an antitrust claim such as is

2  asserted in this Complaint.  This class action presents no difficulties in management that would

3  preclude maintenance of a class action.

4      30.    The members of the Classes are readily identifiable from the files of Defendants.

5  ### INTERSTATE TRADE AND COMMERCE

6      31.    Flat glass is fungible.  One Defendant's basic product is indistinguishable from

7  that of another, and can be readily substituted for the product of a competitor prior to fabrication

8  and/or coatings, and is readily transferable.

9      32.    During a 2004 conference call with investors, Jean-Louis Beffa, Chairman and

10  CEO of Saint-Gobain, characterized the flat glass product as a commodity.

11      33.    Demand for flat glass is inelastic.

12      34.    Flat glass is typically sold to indirect purchasers by the truck-load.  A truck-load

13  contains approximately 10,000 - 12, 000 square feet of product and weights 40,000 pounds,

14  which includes packaging.  Flat glass may also be sold in quantities less than a truck-load.

15      35.    The market for the production and distribution of flat glass is a multi-billion dollar

16  industry nationally.  Flat glass is used, inter alia, for buildings and homes, and automobiles.

17      36.    The national and global markets for flat glass are dominated by an oligopoly of

18  major manufacturers, including Defendants.

19      37.    Defendants' unlawful activities, as described herein, took place within the flow of

20  interstate commerce between Defendants and members of the Plaintiff classes who were located

21  in states other than the states in which Defendants are located, and had a indirect, substantial, and

22  reasonably foreseeable effect upon interstate commerce.

23  ### DEFENDANTS AND THE FLAT GLASS INDUSTRY

24      38.    Defendants are each other's principal horizontal competitors in the production and

25  sale of flat glass in the United States and abroad.

26      39.    The flat glass industry is highly concentrated both domestically and globally.

27  Defendants Saint-Gobain, Nippon, Asahi, and Guardian have a combined global market share of

28  over 67%.

-9-

40.    Citibank has reported that as of 2005, flat glass global production was about 41 million tons, 70% of which is building glass.

41.    Citibank has reported that as of 2005, the global market was divided as follows: Pilkington (including affiliates), 20.5%; Asahi (including ACG), 20.5%; Saint-Gobain, 14%; Guardian, 13.5%; PPG, 5%; Taiwan Glass, 3.9%; and other, 23%.

42.    Pilkington's 2004 annual report details that it, Saint-Gobain, Asahi, and Guardina, collectively represent 62% of the global market for float glass.

43.    The flat glass industry has high barriers to entry, including the high cost of building manufacturing plants (in the range of $100 million or more), distribution systems, and various environmental issues.

44.    Over supply in the flat glass industry can lead to rapid swings in pricing.

45.    Energy costs are a variable cost to Defendants.  When energy costs increase, without a concomitant offsetting increase in demand, the profits of Defendants will decrease.

46.    Companies have various methods available to them to protect against fluctuations in energy costs, including entering into long-term supply contacts with suppliers of natural gas to hedge the volatility of energy prices.

47.    Defendants, however, agreed to implement, fix, and maintain energy surcharges in excess of actual energy costs.

48.    The flat glass industry is characterized by slim profit margins.  Defendants are motivated to combing and conspire by the necessity of decreasing their operating ratios to a level that continues to ensure the viability of continued individual operations.

49.    Industry conferences, such as the Glass Expo and Glass Forum, are conducted frequently and attended by all members of the flat glass industry, including Defendants' representatives.

### THE NATURE OF THE UNLAWFUL CONSPIRACY

50.    In or about October 2000, Defendants began imposing what they called energy surcharges, on top of their prices for flat glass.  Though it is exceedingly unlikely that Defendants

-10-

1    have identical energy costs, because, inter alia, manufacturing plants are not identical and

2    manufacturers can, and did adopt different hedging strategies against the costs of natural gas,

3    Defendants adopted and implemented identical surcharges.

4          51.    The Defendants agreed to fix, peg, raise, and maintain natural gas, energy

5    surcharges by adopting a common surcharge formula pegged to the CALIFORNIA mercantile

6    Exchange, Inc. ("NYMEX") futures.

7          52.    Defendants' energy surcharges, calculated by this formula, exceeded the true

8    increase in average energy costs incurred by the industry.  The energy surcharges also were

9    higher than would have prevailed in a competitive market.  But for the illegal agreement, Plaintiff

10    class members would have paid no, or lower, energy surcharges, and ultimately would have paid

11    less for flat glass from Defendants.

12          53.    The Defendants' energy surcharges were reportedly applied across all types of flat

13    glass, regardless of the actual, underlying cost of producing particular types of flat glass, and thus

14    were simpler for Defendants to agree on and monitor than product-specific price increases would

15    have been.

16          54.    The public announcements that preceded the imposition of the surcharges

17    facilitated collusion by allowing Defendants to communicate and signal to each other concerning

18    the surcharges in advance of their imposition.

19          55.    The automatic nature of the surcharges - being ties to a common formula - further

20    facilitated collusion by allowing Defendants to collude over an extended period of time without

21    have to repeatedly renegotiate their agreement.

22          56.    Defendants knowingly engaged in price fixing, a per se violation of the antitrust

23    laws, as well as unreasonable agreement in restraint of trade, by conspiring to calculate energy

24    surcharges imposed on their customers via a common formula, as set forth below:

25          A.    Natural Gas Surcharges in the United States

| NYMEX 3-Month Average (MMBTU) | Surcharge per truck-load |
| --- | --- |
| $9.00 - 9.55 | $1,400 |
| $8.50 - 8.99 | $1,300 |

-11-

| | |
|---|---|
| $8.00 - 8.49 | $1,200 |
| $7.50 - 7.99 | $1,100 |
| $7.00 - 7.49 | $1,000 |
| $6.50 - 6.99 | $900 |
| $6.00 - 6.49 | $800 |
| $5.50 - 5.99 | $700 |
| $5.00 - 5.49 | $600 |
| $4.50 - 4.99 | $500 |
| $4.00 - 4.49 | $400 |
| $3.50 - 3.99 | $300 |
| $3.00 - 3.49 | $200 |

B.    Diesel Fuel Surcharges in the United States

| Dollar Per Gallon 12-Week Average | Surcharge per truck-load |
|---|---|
| $3.09 - 3.21 | $425 |
| $2.96 - 3.08 | $400 |
| $2.83 - 2.95 | $375 |
| $2.70 - 2.82 | $350 |
| $2.57 - 2.69 | $325 |
| $2.44 - 2.56 | $300 |
| $2.31 - 2.43 | $275 |

57.    Defendants implemented and adjusted energy surcharges at the same time and in the same amounts, regardless of actual costs.

58.    Defendants did not engage in price competition relating to energy surcharges.

29.    Defendants Saint-Gobain, Guardian, and Pilkington, have reported using long-

-12-

1    term supply contacts to hedge price volatility of natural gas, undermining any claim by these

2    Defendants that they need to impose an energy surcharge charge at all, much less a uniform one.

3    For example:

4            (a)    During January 2004, Defendant Pilkington entered into a 10-year

5          natural gas supply agreement with Enron Energy Services to manage its natural

6          gas requirements for its domestic manufacturing facilities in North Carolina,

7          Kentucky, Indiana, Ohio, Michigan, Illinois, and California;

8            (b)    During a November 2004 conference call with investors, Defendant

9          Saint-Gobain acknowledged that the company's strategy against increasing natural

10         gas costs was to enter into long-term supply contracts and impose energy

11         surcharges to customer; and

12            (c)    During 2005, Defendant Guardian entered into negotiations with

13         NORTHERN California Gas Company for a 15-year term supply contract for

14         natural gas.

15        60.    Defendants' failure to engage in price competition relating to energy surcharges

16    can be plausibly explained only by an agreement to charge identical or nearly identical

17    surcharges.  Defendants' charging of common surcharges despite each having different actual

18    energy costs and different hedging strategies militates against any possibility that Defendants

19    acted independently or for any legitimate business purpose.  It would have been against the

20    unilateral, individual self-interest of each Defendant to impose the surcharges at issue absent an

21    agreement amongst Defendants.

22        61.    Defendants jointly and collective, throughout the United States and Europe,

23    profited from the unlawful "surcharges" in amounts totaling many millions of dollars,

24    representing, inter alia, the difference between their actual energy costs and the amounts they

25    unlawfully charged Plaintiff and the members of the classes.

26        62.    Saint-Gobain's introduction and adjustments of energy surcharges on truck-loads

27    of flat glass in North American markets mirror those imposed in Europe and by the same

28    horizontal competitors who were fined by the European Commission for price-fixing.

-13-

## THE CARTEL'S ACTIVITIES

63.     During October and November 2000, AGC, Guardian, Pilkington, and PPG Industries, Inc. ("PPG"), almost simultaneously imposed a natural gas energy surcharge, on top of the cost of flat glass, in an amount of $300 per truck-load in the United States, effective immediately.

64.     Effective January 2001, it was reported that AGC, Guardian, Pilkington, and PPG, each increased its energy surcharge in the United States to $500 per truck-load.

65.     Defendants' adjustments to natural gas surcharges within the United States from 2001 to 2003 were as follows:

| Dates | Natural Gas Energy Surcharge |
|---|---|
| 2Q 2001 | $500 |
| 3Q 2001 | $100 |
| 4Q 2001 | $0 |
| 1Q 2002 | $0 |
| 2Q 2002 | $200 |
| 3Q 2002 | $200 |
| 4Q 2002 | $300 |
| 1Q 003 | $900 |
| 2Q 2003 | $700 |
| 3Q 2003 | $500 |

66.     On September 20, 2001, The Gale Group reported in an article entitles "Glass price hikes blamed on raw materials and fuel costs UK; Glass prices increase for second time in 2001," that Saint-Gobain, Pilkington, and Glaverbel jointly adopted flat glass price increases in the EU of 11% during March, and 9% during September 2001, allegedly reflecting the increase costs of raw materials, "particularly in the gas sector."

-14-

67.    During the 2003 Summer Northeast Window & Door Association meeting, Scott Hoover of Pilkington and Larry Tumminia of ACG gave a joint presentation on the *State of the Glass Industry - The Economic Future of Glass.* During this presentation, Messrs Tumminia and Hoover openly discussed energy surcharges and told *the audience that they should expect an upward trend in prices.* Representatives of Guardian were also present at this meeting.

68.    On October 10, 2003, during a conference call with investors, William Hernandez, PPG's senior vice president and chief financial officer, acknowledged that flat glass price increases during 2003 were largely the result of natural gas energy surcharges.

69.    One former Director of Strategic Development at Guardian, who was with Guardian for approximately two years ending 2004, acknowledged that flat glass price increases during 2003 were largely the result of natural gas energy surcharges.

70.    On November 3, 2004, Stuart Chambers, Chief Executive of Pilkington, did a phone interview with AFX International about its quarterly results and fuel surcharges. During this phone interview, Mr. Chambers disclosed the mechanics of the diesel fuel surcharge, "The surcharge is based on a sliding scale linked to the price of Brent crude and deliveries of glass."

71.    Later during November 2004, the Financial Times also interviewed Mr. Chambers, Chief Executive of Pilkington. In this article, the FT reported that energy surcharges were adjusted to $955 per truck-load, and that Pilkington generated approximately $15 million annually from energy surcharges in the North American market.

72.    During March 2005, Guardian, and PPG each announced their intention to adjust natural gas surcharges to $800 per truck-load, effective second quarter 2005.

73.    During May 2005, Guillerme Huguen, Managing Director of Saint-Gobain Glass UK, was interviewed by an industry organization. During this interview, Mr. Huguen was asked about the energy surcharge adopted in the EU during the 4Q 2004. In response, Mr. Huguen reportedly stated that, "The surcharge has been applied [in Europe] since November now, and it has been fully justified...It seems to be working here and across Europe, just like it has been working for years now in the US."

74.    One former AGC salesperson, who was with AGC for approximately eighteen

-15-

1   years ending 2005, was told by AGC corporate never to negotiate down or "play games" with

2   energy surcharges, as opposed to product prices, while negotiating flat glass sales with

3   prospective customers.

4          75.    During June 2005, Pilkington announced strong year-end results ending March 31,

5   2004, relying in part on its levying of energy surcharges in the EU and North American markets.

6   Pilkington also announced that it would increase its dividend to shareholders.

7          76.    Announced during September and October 2005, Saint-Gobain, AGC, Guardian,

8   Pilkington, and PPG, each introduced diesel surcharges of $275 per truck-load for North

9   American markets, effective fourth quarter 2005.  Natural gas related energy surcharges were

10  increased to $1,200 per truck-load, effective fourth quarter 2005.

11         77.    Announced during December 2005, Saint-Gobain, AGC, Pilkington, and PPG

12  each raised diesel and natural gas energy surcharges to $375 and $2,100 per truck-load, effective

13  first quarter 2006.

14         78.    During the later part of the first quarter 2006, Saint-Gobain, AGC, Pilkington, and

15  PPG each announced that it would adjust diesel and natural gas surcharges to $300 and $1,400

16  per truck-load, effective second quarter 2006.

17         79.    During June 2006, Saint-Gobain, Guardian, Pilkington, and PPG each announced

18  that it would adjust diesel and natural gas surcharges to $350 and $900 per truck-load, effective

19  third quarter 2006.

20         80.    During September 2006, Saint-Gobain, AGC, Pilkington, and PPG each

21  announced that it would adjust diesel and natural gas surcharges to $400 and $900 per truck-load,

22  effective fourth quarter 2006.

23         81.    During December 2006, Saint-Gobain, AGC, Pilkington, and PPG each

24  announced that it would adjust diesel and natural gas surcharges to $300 and $900 per truck-load,

25  effective fourth quarter 2007.

26         82.    During March 2007, Saint-Gobain, AGC, Pilkington, and PPG each announced

27  that it would adjust diesel and natural gas surcharges to $300 and $900 per truck-load, effective

28  second quarter 2006.

-16-

## EUROPEAN COMMISSION OPENS AN INVESTIGATION RELATING TO A CARTEL WITHIN THE FLAT GLASS INDUSTRY

83.    On February 22 and 23, 2005, the EC antitrust authority conducted a raid on offices of Saint-Gobain in Paris, France, Aachen, Germany and Sweden.  On February 24, 2005, the EC also raided the offices of Pilkington in the United Kingdom, AGC (f/k/a Glaverberl SA in Europe) in Belgium, and Guardian Glass Company's European office.

84.    The EC's raids related to the alleged price-fixing of flat glass and the introduction of an energy surcharge on sales of flat glass.  The EC stated that "[t]he Commission has reason to believe that the companies concerned may have violated (a European Union) treaty, which prohibits practices such as price fixing."

85.    In the United States, in April/May 2006, Defendants implemented the same response to complaints about their diesel fuel surcharges - Defendants Guardian, AFG (now AGC) and Pilkington each substituted a 3% price hike in place of the diesel surcharge.

86.    On March 14, 2007, the EC antitrust authority confirmed that it served Statements of Objections to a number of glass manufacturers alleging their role in a cartel to fix the price, allocate markets, and implement a so called "energy surcharges" for flat glass.

87.    On March 17, 2007, Saint-Gobain acknowledged that it was served with a Statement of Objection.

88.    On March 14, 2007, Asahi acknowledged that on March 13, 2007, Glaverbel SA (AGC's European affiliate) was served with Statement of Objection with respect to alleged anticompetitive conduct with the flat glass industry.

89.    On March 15, 2007, Nippon acknowledged that on March 13, 2007, Pilkington was served with Statement of Objection with respect to alleged anticompetitive conduct with the flat glass industry.

90.    On May 23, 2007, Nippon announces that it would set-aside $691 million for penalties relating to Pilkington's alleged participation in a cartel to fix prices of flat glass and related energy surcharges.

-17-

1

2      91.    On May 24, 2007, Saint-Gobain announced that *it would not dispute the EC's*

3    *allegation that it participated in a cartel to fix prices of flat glass and related energy surcharges*

4    and set-aside €650 million for penalties.

5      92.    On November 28, 2007, the EU ordered Asahi, Guardian, Pilkington, and Saint-

6    Gobain to pay a total of €486,900,000 in antitrust fines for their participation in a cartel relating

7    to the flat glass cartel.

8      93.    The same or substantially the same flat glass price adjustments and energy

9    surcharges at issue in the EC's complaint, which Saint-Gobain has announced that it would not

10    dispute, were also implemented and increased in North American markets by Saint-Gobain and

11    its co-conspirators.

12      94.    Defendants fraudulently concealed their price-fixing conduct and their

13    participation in the cartel and conspiracy alleged herein.  Plaintiff and the Classes could not have

14    discovered the existence of the conspiracy alleged herein any earlier than its public disclosure.

15    Defendants did not reveal that their imposition of surcharges was pursuant to agreement.

16      95.    Defendants' conduct constitutes a *per se* violation of Section 1 of the Sherman

17    Act.

18      ## COUNT 1 - VIOLATIONS OF THE SHERMAN ACT

19      96.    Plaintiff incorporates by reference as if fully set forth herein the allegations

20    contained in the preceding paragraphs of this Complaint.

21      97.    During the Class Periods, Defendants and their co-conspirators engaged in a

22    continuing agreement, understanding, and conspiracy in restraint of trade to implement,

23    artificially raise, fix, maintain, and/or stabilize the prices of flat glass related energy surcharges,

24    in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25      98.    In formulating and effectuating the alleged contract, combination, or conspiracy,

26    Defendants and their co-conspirators engaged in anti-competitive activities, the purse and effect

27    of which were to artificially raise, fix, maintain, and/or stabilize the prices of flat glass related

28    energy surcharges.

-18-

COMPLAINT

99.    During the Class Periods, Plaintiff and members of the Classes purchased flat glass with energy surcharges indirectly from Defendants and their co-conspirators (or their respective agents, predecessors, subsidiaries, affiliates, and/or business partners).

100.    The illegal combination and conspiracy alleged herein had the following effects, among others:

(a)    price competition in the pricing of flat glass related energy surcharges has been restrained, suppressed, and/or eliminated;

(b)    prices charged by Defendants for flat glass related energy surcharges were fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

(c)    prices paid by Plaintiff and members of the Classes for flat glass related energy surcharges charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

(d)    Defendants refused to engage in price competition for flat glass related energy surcharges.

101.    Defendants' anticompetitive activities and their effects are in violation of the Sherman Act.

102.    During the Class Periods, Defendants sold flat glass in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such services across state boundaries. Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anticompetitive effect upon, interstate commerce within the United States.

103.    Plaintiff and members of the Classes seek injunctive relief, and treble damages, and any such other relief that the Court deems necessary and appropriate.

104.    Plaintiff and members of the Classes have been required to pay more for flat glass energy surcharges in the United States that they would have paid in a competitive marketplace absent Defendants' price fixing cartel.

105.    During the Class Periods, Defendants' flat glass related energy surcharge conspiracy as described herein caused Plaintiff and the members of the Classes to pay artificially

-19-

1    inflated prices for flat glass related energy surcharges that they would not have paid absent such

2    violations. As a result, Plaintiff and the members of the Classes have been injured and damaged

3    in their business and property in an amount to be determined according to proof.

4    106.    As a direct and proximate result of Defendants' illegal conspiracy, Plaintiff and members

5    of the Classes have been injured and damaged in their respective businesses and property, in that

6    they have paid artificially inflated prices during the Class Periods that they would not have paid

7    in the absence of the illegal conspiracy.

8                                    **PRAYER FOR RELIEF**

9        **WHEREFORE,** Plaintiff prays that:

10           (A)    That the Court determine that this action may be maintained as a class
11    action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

12           (B)    The Court certify the Classes as follows:

13               (a)    All individuals or entities (excluding governmental entities,
14    Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and
      Defendants's co-conspirators) in the United States that purchased flat glass indirectly
15    from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or
      agents, and paid energy surcharges relating to natural gas at any time during the period
16    from January 1, 2001, through such time in the future as the effects of Defendants' illegal
      conduct, as alleged herein, has ceases.
17

18               (b)    All individuals or entities (excluding governmental entities,
      Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and
19    Defendants' co-conspirators) in the United States that purchased flat glass indirectly from
      any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and
20    paid energy surcharges relating to diesel fuel at any time during the period from October
      15, 2005, through such time in the future as the effects of Defendants' illegal conduct, as
21    alleged herein, has ceased.

22               (c)    That Plaintiff and the other members of the Class recover
      compensatory damages, as provided by law, determined to have been sustained as to each
23    of them, and that judgment be entered against Defendants on behalf of Plaintiff and each
      and every member of the Class;
24

25               (d)    That Plaintiff and the other members of the Class recover treble
      damages, as provided by law;
26

27               (e)    That Plaintiff and the other members of the Class recover their
      costs of the suit, including attorneys' fees, as provided by law; and

28

1          (C)    The Court adjudge and decree that the contract, combination and

2 conspiracy alleged herein in a per se unreasonable restraint of trade violation of Section 1 of the

3 Sherman Act;

4          (D)    Judgment be entered against Defendants, jointly and severally, and in favor

5 of Plaintiff and the Classes for damages as allowed by law in an amount determine to have been

6 sustained by them;

7          (E)    The Court award Plaintiff and the Class attorneys' fees and costs, and pre-

8 judgment and post-judgment interest as permitted by law;

9          (F)    The Court enjoin and restrain Defendants from engaging in any such

10 agreement and price fixing in the future; and

11          (G)    Award Plaintiff and the Classes such other relief as may be necessary and

12 appropriate.

13

14 Date: May _l_, 2008                    Respectfully submitted,

15

16

17                                 By: _Reginald Terrell_____

18                                      DONALD AMAMGBO
                                        REGINALD TERRELL
19                                      Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

COMPLAINT

-21-